UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| PORT OF RIDGEFIELD, a Washington municipal corporation, | CASE NO. CV14-6024RBL |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| UNION PACIFIC RAILROAD COMPANY, a Delaware corporation, | |
| Defendant. | |

Following the bench trial in this matter beginning November 26, 2018 to December 19, 2018, the Court makes the following Findings of Fact and Conclusions of Law:

## I. FINDINGS OF FACT

1.      From 1964 to 1993, Pacific Wood Treating ("PWT") operated a wood pressure-treating facility and manufacturing facility on the Lake River Industrial Site ("LRIS") in Ridgefield, Clark County, Washington.

2.      The LRIS is generally located at 111 West Division Street in Ridgefield, Washington. It is bounded on the east by a Burlington Northern Santa Fe Railroad ("BNSF") main line, on the west by a portion of Lake River, on the north by Carty Lake and the Ridgefield

National Wildlife Refuge, and on the south by the Port's marina property, Railroad Overpass property and a portion of McCuddy's Marina. The larger Site is "defined by the extent of contamination caused by the release of hazardous substances at the Site," and includes an off-property area to the east of the BNSF main line.

3. PWT's operations included pressure-treating wood with oil-based solutions containing creosote, pentachlorophenol ("PCP"), and chromated copper arsenate ("CCA"), which is a mixture of copper, chromium and arsenic.

4. PWT and its parent company Niedermeyer-Martin declared bankruptcy and ceased operations in August 1993. PWT's president Edward Niedermeyer, also declared bankruptcy. He is now deceased.

5. The Port owned, and leased to PWT during 1964-1993, 24 acres of the LRIS. PWT owned 11.4 acres of the LRIS during its operations. The Port acquired this land in the PWT bankruptcy. The City of Ridgefield ("City") owned, and leased to PWT during 1964-1993, approximately 0.5 acres of the LRIS. The Port acquired this land in 2010. Union Pacific owned, and leased to PWT during 1964-1993, approximately 2 acres at the LRIS. The Port acquired this land in May 2013. The Port also owns the Railroad Avenue properties (.62 acre), Marina property (1 acre) and the Railroad overpass property (1.35 acres).

6. PWT's operations on the properties it leased from the Port's (and City) included the following: "retorts" used for chemically treating lumber and poles, a drip pad, untreated wood storage areas, treated lumber storage and shipping areas, a truck scale, rail spur and tram tracks, an unlined surface impoundment, a concrete pond, a French drain, a sludge incinerator, and, beginning in the 1980s, a wastewater treatment plant. These areas were later designated as Cells 1 and 2 in an Ecology Agreed Order. Cell 4, also known as the North Pole Yard, was used

for debarking poles and storing untreated and treated poles. Cells 1, 2 and 4 are all located north of Division Street at the Site.

7.     Union Pacific owned and leased to PWT an approximately two-acre parcel. It is located at the southeastern portion of the Site, south of Division Street. It comprises approximately  24 percent of the South Pole Yard (later designated Cell 3). This parcel was used for storing untreated scaffolding planks, a rail spur and, beginning in about 1968, areas for storing and shipping treated poles, an office, and tram tracks. A drip trough was installed on this property in 1988.

8.     The Port owned the remainder of Cell 3 and leased it to PWT from 1964-1993. It included an area for inspecting newly-treated poles, areas for storing treated poles and lumber, a barge loading ramp, and storing discarded scraps of treated wood.

9.     Former PWT employees testified that the most contaminated part of the Site was the area of the retorts and drip pad, on the Port- and City-owned portions of the Site.

10.     Most of the contamination at the Site occurred during the "Vietnam Order." This was an intense 2-3 year period of operations in the mid-1960s, during which PWT supplied treated lumber and plywood to the federal government for construction projects in Vietnam. This contamination occurred primarily in the retort, drip pad and yard areas of Cells 1 and 2 (the Port and City property). This finding is based on the testimony of former PWT employees, and is corroborated by aerial photographs, imagery analysis and other evidence.

11.     During the Vietnam Order, wood treating operations were 24/7. Treated lumber was loaded directly on trucks in Cell 2, which then left the Site still dripping chemicals. Division Street—the truck route from the Site through the residential neighborhood to the east—was wet

1   with chemicals, and the drip pad and adjacent yard area in Cell 2 were so saturated that the

2   chemicals caused PWT employees' boots to deteriorate.

3        12.    Trucks or barges transported Vietnam Order products to nearby seaports for

4   shipment to Vietnam. Trucks were loaded near the drip pad and "yard" in Cell 2 (the Port's

5   property), and barges were loaded in the western portion of Cell 3 (also the Port's property).

6        13.    During the Vietnam Order, the tram tracks did not extend from the Cell 2 drip pad

7   to the Union Pacific property on Cell 3. Nor was that property used for the storage or shipment

8   of treated wood products. Those uses of those areas began in about 1968.

9        14.    Deliveries of wood treating chemicals, raw wood and other freight during the

10  Vietnam Order, and thereafter, occurred by truck or by rail on the spur near the retorts and tank

11  farm in Cell 2 (the Port's property).  (Dep. Designation at 25:15-28:9 (Foster); 12/6/18 Tr. at

12  30:14-34:8, 35:7-36:6 (Ryf); 12/6/18 Tr. at 86:12-89:20 (Carel)).

13       15.    After the Vietnam Order, PWT expanded and diversified its operations to include

14  fabrication of laminated beams, guitar backs and other types of untreated wood products. It

15  constructed new fabrication facilities on the western portion of Cell 2, and hired additional

16  personnel to operate the new facilities.

17       16.    After the Vietnam Order, PWT began to use the South Pole Yard (Cell 3),

18  including the Union Pacific property, for inspecting, sorting and shipping treated poles. Poles

19  were taken from the North Pole Yard (Cell 4) to the retorts on trams and treated. They were

20  allowed to remain on the drip pad outside the retorts until they cooled and the chemicals were

21  absorbed.  The poles would then be transported to an inspection area in the western portion of

22  Cell 3 (the Port's property) before storage throughout Cell 3.

23

24

17.     According to former PWT employees, the inspection area was the most visibly contaminated part of Cell 3 but, overall, Cell 3 (including the Union Pacific property) was much less contaminated than the tank farm, retort, drip pad and yard areas in Cells 1 and 2.

18.     Throughout PWT's operations, it stored and shipped treated lumber (as opposed to poles) primarily from the "yard," southwest of the retorts and north of Division Street on the Port's property in Cell 2. Lumber was delivered to the yard by truck or rail, treated in the retorts, and (after the Vietnam Order) allowed to remain on the drip pad outside the retorts until it cooled and the chemicals were absorbed. The treated lumber would then be stored in areas of the yard west of the drip pad, on Cell 2, before being loaded on trucks in that area for shipment offsite.

19.     According to the former PWT employees, there was little drippage from treated lumber or poles after the Vietnam Order, although some chemical spills occurred, primarily in the retort area in Cells 1 and 2.

20.     According to the former PWT employees, there was no significant tracking of chemicals by vehicles within the Site after the Vietnam Order but, as former PWT Environmental Manager Bryant Adams, Ph.D. explained, any tracking of chemicals that did occur was *from* the retort area *to* the Union Pacific property.

21.     Ecology Cleanup Project Manager Craig Rankine similarly testified that any tracking would have been from areas of higher contamination to less impacted areas, not the other way around, and that any tracking from Cell 3 did not cause additional remediation requirements or costs elsewhere at the Site

22.     Union Pacific expert witnesses Robert Sterrett, Ph.D. (Itasca), and Mark Larsen (Anchor QEA) similarly testified that concentrations of PCP, arsenic and dioxin in soil samples

taken at the Site do not support vehicle tracking from the former Union Pacific property causing any additional remediation requirements or costs elsewhere at the Site.

23. The Port's consultant and expert witness, Jim Maul, acknowledged at trial that, despite working on the Site for more than 20 years none of Maul Foster & Alongi ("MFA") reports referenced vehicle tracking from the former Union Pacific property causing contamination elsewhere at the Site. He testified that there is "no way of knowing" the extent of any contribution, and that he did not develop the tracking theory until after he learned of Ecology's proposed *de minimis* settlement with Union Pacific.

24. The BNSF main line and rail spurs in Cell 2 were used for delivering and shipping freight, chemicals, and untreated and treated lumber products. After the Vietnam Order, the rail spur on the Union Pacific property in Cell 3 was used to ship treated poles from the Site. The Port and its other customers and lessees also used the BNSF main line and rail spurs in Cells 2 and 3.

25. It is undisputed that BNSF and Union Pacific provided freight services at the Site as common carriers. Neither the Port nor Union Pacific was an operator at the Site as that term is used under MTCA.

26. PWT provided $1,787,334.00 to the EPA for cleanup activities and for natural resource damage assessment and restoration. These funds were placed in an EPA Drip Pad Trust Fund account. After PWT's bankruptcy, these funds were transferred to Ecology, and ultimately were made available to the Port for investigation or cleanup of the Site.

27. Following PWT's bankruptcy, the Port leased portions of the Site to new commercial/industrial tenants. The Port also rented the Union Pacific property, and subleased it

to commercial/industrial tenants. During this period, the Port paid its lease payments to Union Pacific with Ecology remedial action grants.

28.     Ecology issued a PLP status letter to the Port dated July 15, 1996, pursuant to RCW 70.105D.040, 70.105D.020(21), and WAC 173-340-500. On August 6, 1996, the Port voluntarily waived its rights to notice and comment and accepted Ecology's determination that the Port is a PLP under RCW 70.105D.040.

29.     On September 23, 1996, the Port entered into the first of three Agreed Orders with Ecology, accepting responsibility for Site investigation and remedial action.

30.     In January 1997, Ecology provided the Port with the first of ten grants for remedial action costs. Ecology also provided no interest loans (most of which were later forgiven), for total funding of more than $80 million—the largest in MTCA history.

31.     Ecology was motivated to provide this funding due to the extent and cost of the required remediation, the Port's inability to pay, the City's and County's economically disadvantaged status, the potential for economic redevelopment, and the opportunity to implement an innovative technology—steam enhanced remediation ("SER")—that might be used at other MTCA sites.

32.     From 1993 – 2013, the Port received 10 separate grant and loan packages from Ecology totaling $81,058,537, including Ecology's "Hammer Fund" grant. The grants and forgiven loans were funded through the State Toxics Control Account, which is in turn funded by hazardous waste fees paid by industry, not individual taxpayers.

33.     Of the $81,058,537 in Ecology funding, $18,963,490 was originally provided as no-interest loans. At the Port's request, Ecology has forgiven $14,563,268 of this original loan obligation.

34.     The Port remains obligated to repay only $4,400,222 in Ecology loans. These loans have not been forgiven, but are 0% interest loans with repayment terms of 44 and 45 years. The Port does not have to begin re-paying these loans until 2020 and 2021. The payments begin at approximately $35,000 annually, and increase to $50,000 annually, but most of the balance is due in large balloon payments in 2063 and 2064, if they are not between now and then.

35.     Ecology did not condition its grants or loans (or the forgiveness of some of those loans) on the Port bringing a MTCA contribution action against Union Pacific.

36.     Ecology issued a PLP status letter to the City on April 3, 1997. It notified the City that it had determined the City was a PLP on May 6, 1997.  (Def. Ex. A-50; Pl. Ex. 6 at 10:1-6)

37.     The Port received insurance proceeds and coverage settlements totaling about $5,380,000.00. $1,930,000 came from PWT insurance policies assigned to the Port by PWT's bankruptcy estate. The insurance money went to the Port because it was performing cleanup at the Site. The Port's Executive Director, Brent Grening, signed an affidavit claiming the Port needed the proceeds because they were the Port's only source of cleanup money. Grening testified at trial that the money was used to stabilize the Port's finances.

38.     The Port and Ecology entered into Agreed Orders in 1996, 2001, and 2014. The Port accepted responsibility for remediation action, and Ecology agreed to provide grants and loans to fund investigation and contamination remediation at the Site.

39.     The Port performed interim remedial actions consistent with the 2001 Agreed Order. These work plans were specific to the cells described in that Order, including Cell 3. That work was completed by 2013.

40.     Extensive soil and groundwater contamination was found in Cells 1 and 2, extending to depths exceeding 60 feet. As a result of this contamination, the Port implemented

SER, excavated more than 6,200 cubic yards of contaminated soil, and remediated sediments in Lake River North and Carty Lake, and engaged in other remedial measures. Approximately $50-55 million was spent on SER alone during the remediation of Cells 1 and 2 at the Site. These severe impacts were caused by source areas in Cells 1 and 2 (the Port and City property), not by contamination originating at the Union Pacific property, or other areas of Cell 3.

41.     By contrast, the Cell 3 contamination required no groundwater remediation, and required excavation of only 463 cubic yards of shallow soil contamination on the Union Pacific property. Sediment remediation associated with Cell 3 in Lake River South was also much more limited, less costly than, and distinguishable from remediation of sediments associated with Cell 2 in Lake River North.

42.     Ecology estimated the total cost of remedial action for Cell 3 and related sediments at approximately $2,974,000.

43.     Off-Site remediation consists of soil excavation and landscape restoration at properties with dioxin concentrations exceeding Ecology's prescribed clean-up level. These properties are principally located along routes trucks historically used when leaving the Site.

44.     On-site sources of dioxin—including the hog fuel boiler, diesel exhaust emissions from trains on the BNSF main line and diesel machinery, and dust emissions—contributed only negligibly to off-site dioxin, or these sources did not match the spatial pattern of dioxin off-site.  The prevailing (and highest velocity) winds at the Site are from the north, so if wind-blown dust contributed to off-site contamination, the highest concentrations would be south of the Site.  However, sampling south of Cell 3 did not show elevated concentrations of dioxin.

45.     The evidence demonstrates that trucks leaving PWT's property during PWT's operations were the primary source of dioxin in the off-site neighborhood.  Again, according to

former PWT employees, trucks were loaded with treated lumber in Cell 2 (the Port's property) during the Vietnam Order, and PWT continued to load them there for the remainder of its operations.

46.    Union Pacific stepped up to the plate early in the remedial action history, providing technical and financial support for Site investigation and remediation pursuant to a Funding and Participation Agreement ("FPA") with the Port beginning in 2002. The FPA provided a "final allocation" focused on Cell 3, because that portion of the Site was owned partly by the Port and partly by Union Pacific.

47.    Pursuant to the FPA, the Port received funding and technical support from Union Pacific totaling $1.78 million, including $861,000 in direct payments to the Port. Grening testified that Union Pacific's funding was used for remedial action costs, and he and MFA Project Engineer Steve Taylor acknowledged that Union Pacific's consultants' technical support was in connection with remedial action work by the Port and its own consultants.

48.    In exchange for Union Pacific's financial and technical support, and subject to completion of a remedial investigation/feasibility study ("RI/FS"), the FPA required the Port to "support and cooperate" with Union Pacific's efforts to obtain a "comfort letter" from Ecology, or to "negotiate a cash-out Consent Decree for the entire Site with Ecology." At the same time, however, the FPA reserved to the Port the right to bring a MTCA contribution action against Union Pacific.

49.    On May 29, 2013, the Port purchased Union Pacific's property at the Site by under threat of condemnation. The Port used Ecology grant money for a portion of the sale price.

50.    A final RI/FS was issued in July 2013, following completion of remedial actions in Cells 1, 2, 3 and 4. It identified additional requirements for sediment remediation in Lake River, ongoing monitoring, and other matters.

51.    The Port and the City entered into a Consent Decree with Ecology, which was approved by Clark County Superior Court on November 5, 2013. That Consent Decree documented the remedial actions and addressed remaining issues at the Site.

52.    Ecology named Union Pacific a PLP on November 6, 2013, the day after the Consent Decree between the Port, Ecology and the City was approved in state court.

53.    Ecology had provided notice of its intent to name Union Pacific as a PLP on September 13, 2013, as a former owner of a portion of the Site.  The proposed PLP findings were based on evidence that "UPRR owned approximately 2.08 acres" at the PWT Site, that "[t]he UPRR property was used for limited storage and loading rail cars with treated wood products," and that "[w]ood treating solutions dripped from treated wood products stored and handled at the UPRR property after it was removed from pressure treating vessels. A drip trough was used to recover excess wood treating solution liquid was located on the property."

54.    Union Pacific responded to Ecology (through counsel) on October 24, 2013, noting that "[s]ince 2002, Union Pacific has actively cooperated with the [Port] regarding investigation and remediation activities[,]  . . . provided significant funding for performance of both the RI/FS and the interim remedial action at Cell 3[,] . . . [and] provided extensive technical input to the Port."  Union Pacific expressly reserved all rights and defenses, including divisibility of harm, and requested a meeting to discuss "working with Ecology to resolve all potential claims against Union Pacific at the Site."

55.     Ecology representatives met with Union Pacific representatives on November 20, 2013, to discuss resolution of potential claims relating to the Site.

56.     On February 25, 2014, Union Pacific proposed a *de minimis* settlement with Ecology, pursuant to Policy 520B. Policy 520B, authorized by RCW 70.105D.040(4)(a), enables Ecology to enter into cash-out settlements with PLPs that are found to have a *de minimis* contribution to contamination, relative to other PLPs at the site, and to obtain funding that can only be used for that site.

57.     Ecology thoroughly evaluated Union Pacific's *de minimis* settlement proposal over a period of more than a year, including reviewing site history, areas of contamination, remedial action requirements and costs, and the criteria specified for *de minimis* settlements under Policy 520B. Ecology's Toxics Cleanup Program Southwest Regional Manager Rebecca Lawson took the lead on the evaluation, consulting with Rankine and receiving Pendowski's review and approval of proposed Ecology determinations, in coordination with Assistant Attorney General Ivy Anderson. Lawson had been overseeing remedial actions, funding and related matters concerning the PWT Site for more than 12 years. Anderson had more than 24 years of environmental investigation and remediation experience with Ecology at the time she performed the evaluation.

58.     As part of the evaluation, Ecology received information from the Port about funding that had been provided by Union Pacific, and information from Port consultant Maul Foster concerning environmental conditions relating to the former Union Pacific property, in addition to input from Rankine.

59.     On April 8, 2015, Ecology found that Union Pacific met the Policy 520B criteria for a *de minimis* settlement, including a determination that Union Pacific's contribution at the

Site was "minimal in amount and toxicity." Ecology had been overseeing Site remediation and funding for more than 20 years at the time it made this finding.

60.     Ecology had authority and discretion to make *de minimis* settlement findings under MTCA and Policy 520B.

61.     On September 29, 2015, Ecology reached a "final decision" to for a cash-out settlement with Union Pacific under Policy 520B, for an agreed payment of $2,264,037. The settlement was subject to negotiation and court approval of a consent decree.

62.     Ecology's *de minimis* settlement analysis reflects the divisibility of Cell 3 from the rest of the Site, conservatively allocating 50% of Cell 3 and Lake River South remediation costs to Union Pacific, even though the geographical area of the Union Pacific property was only 24% of Cell 3 It also included a premium for Lake River South since, at that time, remediation there had not been completed. Remediation of Lake River sediments has now been completed and the costs did not exceed Ecology's estimate.

63.     The proposed settlement terms also allocated a 1.4% share to Union Pacific for the Site-wide investigation and the off-property remediation, and included a 100% premium for the off-property area, again because that remediation had not been completed. Evaluation of a new off-property area east of Cell 2 is now underway.  Remaining investigation and remediation of the off-property area is not expected to exceed Ecology's estimate by the 100% premium contemplated by the *de minimis* settlement.

64.     Furthermore, the evidence shows that, to the extent the off-property contamination was principally caused by trucks leaving the Site while still dripping during the Vietnam Order, such trucks left from the Port's property on Cell 2, not the Union Pacific property.  This evidence further supports Ecology's *de minimis* finding and proposed settlement.

65.     The Port neither supported nor cooperated with Union Pacific's proposed *de minimis* settlement with Ecology. Instead, the Port filed this contribution action in opposition to Union Pacific's proposed settlement. The Port filed this lawsuit against Union Pacific before Ecology had responded to Union Pacific's proposal.

66.     Pendowski and Lawson were surprised and puzzled by the Port's opposition to the proposed settlement, given the $81 million in funding provided to the Port by Ecology and the fact that the settlement would benefit the Site. They disagreed with the Port's opposition, and continue to disagree with the Port's opposition to this day.

67.     Among other actions, the Port opposed and sought to undermine Union Pacific's efforts to proceed negotiate a Consent Decree through lobbying and political pressure on Ecology, directly and through state legislators and the Washington Public Port Association, to withdraw from the agreement on settlement terms and to not proceed with negotiations for a consent decree documenting the proposed settlement.

68.     The Director of Ecology subsequently decided to put Consent Decree negotiations "on hold."

69.     Ecology officials have testified that, although consent decree negotiations remain on hold, they stand by their finding that Union Pacific is entitled to *de minimis* contribution status, and that $2,264,037 is the appropriate amount for Union Pacific to pay to resolve its liability for the Site.

70.     In the November 2013 Consent Decree with the Port and the City, Ecology reserved its right to pursue "cost recovery against PLPs not a party to the Consent Decree." Ecology officials also acknowledged Ecology's authority under RCW 70.105D.050(8) to bring

1   an enforcement action to recover "funds expended under the state and local toxics control

2   accounts," which were the source of Ecology's funding of the Port's remedial actions.

3       71.     However, Ecology elected instead to consider Union Pacific's eligibility for a *de*

4   *minimis* settlement and, subject to that determination of eligibility, reach a settlement that would

5   provide funding to directly benefit the Site, pursuant to Policy 520B.

6       72.     The Court finds that Ecology properly considered the evidence and relative

7   remedial costs, and properly applied Policy 520B criteria, in finding on April 8, 2015, that Union

8   Pacific's contribution to the Site was minimal in amount and toxicity and that Union Pacific was

9   entitled to a *de minimis* settlement.

10      73.     The Court finds that Ecology properly considered the evidence and relative

11  remedial costs, and properly applied Policy 520B criteria, in determining on September 29, 2015,

12  that $2,264,037 was the appropriate amount for Union Pacific to pay in the proposed *de minimis*

13  settlement.

14      74.     The Court recognizes that Ecology officials testifying at trial stand by their

15  finding that Union Pacific is entitled to a *de minimis* settlement and the monetary amount. These

16  findings by Ecology are entitled to deference by the Court. Evidence introduced at trial provides

17  additional support for Ecology's findings. As noted above, between 1993-2013 the Port received

18  10 separate grant and loan packages from Ecology totaling $81,058,537, including Ecology's

19  Hammer Fund grant. The grants and forgiven loans were funded through the State Toxics

20  Control Account, which is in turn funded by hazardous waste fees paid by industry, not

21  individual taxpayers.

22      75.     The Port received grant funds from Ecology and other sources to pay for the

23  investigation and remediation of the Site. All of the Ecology grants worked the same way. The

24

Port did not pay expenses directly. When the Port received an invoice, it submitted it to Ecology for payment from the grant. When the money was disbursed from the grant to the Port to pay the invoice, the Port would make the payment.

76. Port employees' salaries, vacation, health-care and overtime have been paid by Ecology grant money, and Ecology grant money was also applied to the Port's overhead expenses. The Port also included other overhead expenses directly on grant reimbursement requests and was reimbursed for these overhead expenses.

77. In addition to the Ecology grants and forgiven loans, the Port also received other grants, from EPA, Housing and Urban Development and other sources, totaling more than $3.9 million. EPA provided $1 million directly to the Site rather than to the Port. The EPA provided the services and managed the funds directly. In total, the Port received approximately $91,206,223 from third party sources to fund the remediation.

78. The federal grants received by the Port also allowed for the reimbursement of Port salaries, benefits and vacation time. The Port is under no reimbursement obligation with respect to any federal funds received. The Port received the federal funding specifically for cleanup purposes, but if it were to be awarded damages from Union Pacific (based on these federal expenditures) the Port would be able to use any such recovery for any purpose.

79. The Port has not paid for Site investigation or remedial action costs that have not been directly funded or reimbursed by a grant, loan, PWT funds, Union Pacific funds, insurance proceeds or other third-party sources.

80. The Port has variously claimed that the total cost of the remediation was $90,269,256 or $90,584,803. But the Port has received over $91,000,000 from third party sources to fund the remediation.

81.     The Port is, at most, obligated to repay Ecology $4.4 million in loans that have not yet come due and, given the no-interest status and small payments until 2063, have a present net value of $630,367.

82.     Thus, Union Pacific has paid, and agreed to pay Ecology, a total of more than $4 million, which exceeds the $2,974,000 that Ecology estimated as the cleanup costs relating to Cell 3 (only part of which was the former Union Pacific property) and related Lake River sediments.

83.     The evidence of the extent of contamination and relative remedial action costs and support the conclusion that Cell 3 contamination, including the Union Pacific parcel, was a small fraction of the remedial requirements and costs in the Port and City property in Cells 1 and 2. Extensive soil and groundwater contamination was found in Cells 1 and 2, extending to depths exceeding 50 feet and requiring excavation of more than 5,700 cubic yards of contaminated soil, in addition to operation of the $50-55 million SER system and other remedial measures. The evidence and expert analyses demonstrate, and even Maul agreed, that these severe impacts were caused by source areas within Cells 1 and 2, not the Union Pacific property or other areas of Cell 3.

84.     By contrast, the evidence has shown that contamination in Cell 3 required no groundwater remediation, and required excavation of only 463 cubic yards of shallow soil on the former Union Pacific property.  Surface water and groundwater flows were to the west southwest in Cell 3, away from other areas of the Site.  Remediation of sediments associated with Cell 3 in Lake River South was much more limited, less costly than and—as Ecology recognized in adopting the *de minimis* settlement structure and consistent with MFA reports—distinguishable from remediation of sediments associated with Cell 2 in Lake River North.  Of the more than $90

1   million spent on remedial action at the Site, Ecology estimated the total cost of remedial action

2   for Cell 3 and related sediments as approximately $2,974,000.

3        85.    Thus, the Court finds the evidence at trial supports the conclusion that Union

4   Pacific's contribution at the Site was minimal in remediation requirements and costs, consistent

5   with Ecology's *de minimis* determination, and a recognized factor in equitable allocation

6   analysis.

7        86.    The Port and Union Pacific also agreed that contamination of Cell 3 and related

8   costs of remediation were distinguishable and divisible from the rest of the Site. The evidence

9   shows that this agreement was motivated by the Port's interest in expediting remediation for

10   redevelopment of Cell 3, given the limited soil contamination and the absence of groundwater

11   contamination at Cell 3, and by Union Pacific's interest in avoiding liability for costs relating to

12   the severe soil and groundwater contamination at Cells 1 and 2 and unrelated to Cell 3, including

13   the SER system.

14        87.    Port CEO Grening told Union Pacific before the parties entered into the FPA that

15   Union Pacific's role would be limited to Cell 3. Evidence relating to historical uses and

16   operations, Site characterization, the nature and extent of contamination, and relative costs of

17   remediation, shows Cell 3-related contamination and remediation to be divisible from the rest of

18   the Site.

19        88.    Evidence relating to historical uses, operations and Site characterization,

20   including the Port's consultant's sampling evidence and reports, also does not support the Port's

21   theory that vehicle tracking, airborne dust, or other transport or migration of chemicals from Cell

22   3 caused contamination requiring additional remedial actions or costs in other areas of the Site.

23

24

89. Furthermore, Port representatives agreed with Union Pacific that remediation of Cell 3 was divisible and distinguishable from the rest of the Site.

90. Port CEO Grening wrote: "[t]he SPY should remain divisible from remainder of the Site (assuming water, soil & sediment data is found to support this conclusion [sic])."

91. The emergence of dioxin as an additional chemical of concern in 2008 did not alter the divisibility of Cell 3 from the rest of the Site. The theory that it did, advanced by Port counsel in opening statement and closing argument, was not supported by the evidence at trial.

92. To the contrary, the Port's consultant and expert Jim Maul acknowledged that the remedial actions already underway in 2008 were completed pursuant to cell-specific work plans, and he could not identify the emergence of dioxin with any additional remediation requirements or costs for the various cells at the Site.

93. Ecology officials testified, and Port consultants acknowledged, that a 2010 change in MTCA policy affecting site-wide remedial investigations did not alter remedial actions being performed pursuant to cell-specific work plans. Furthermore, remediation requirements in Cells 1 and 2 had nothing to do with dioxin, and the emergence of dioxin as a concern did not require additional remediation in any of the cells.

94. The remediation of dioxin contamination in the off-property area east of the Site does not alter the *de minimis* contribution of Union Pacific or the divisibility of Cell 3. As Dr. Libicki opined, the sampling evidence shows that the higher concentrations of dioxin requiring remediation were along the truck routes leaving the Site, not a more general pattern that would be expected from airborne sources. Former PWT plant manager Ed Ryf and PWT employee Ernest Foster testified that trucks departing with dripping treated lumber during the Vietnam

1  Order were loaded and left the Site from the Port's property on Cell 2, and that trucks continued

2  to be loaded with treated lumber and departed from the Port's property thereafter.

3      95.     Indeed, the evidence shows that as these sampling results were developed,

4  Ecology, the Port and Maul Foster all concluded that releases from trucks were the most likely

5  cause of the higher levels of dioxin requiring remediation along truck routes in the off-property

6  area. Maul and Taylor have also acknowledged Maul Foster reports and wind roses showing that

7  prevailing winds were from the north, and that if there were any significant dioxin contamination

8  from airborne dust emissions, elevated dioxin concentrations would be found in samples in the

9  boat launch area to the south of Cell 3; however, elevated levels were not found there.

10     96.     Ecology also agreed that remediation of Cell 3, and related sediments and costs,

11 were divisible from the rest of the Site.

12     97.     To the extent the Port contends that Union Pacific is responsible for PWT's

13 "orphan share," the trial testimony of Ecology Statewide MTCA Cleanup Manager Jim

14 Pendowski addressed the issue:

15         We don't have that term defined, unlike, say, a federal statute. But we use
           it as our way of looking at – we have a liable party, but they are orphaned
16         financially. They have no resource. In this case, you know, they had no
           resource available. We stepped in to cover that basically through grants
17         and loans. And we got a cleanup done. [Q: So there is no orphan share?]
           That's right. And that's why we did it. . . . We, through the Port of
18         Ridgefield, stepped in and filled that gap.

19     98.     Similarly, as stated by Union Pacific allocation expert Rick White, there is no

20 orphan share at the Site: PWT is an orphan party, but there is no orphan share because there was

21 a party to pay the orphan party's share.

22     99.     Even if CERCLA orphan share analysis did apply, case law makes it clear that,

23 where there is an "orphan share" asserted in a private contribution action, it must be allocated

24

equitably among all the parties, with consideration for when and what historical activities occurred to cause contamination, the evolving awareness of environmental issues and pollution prevention requirements over time, and the relative costs for remediation attributable to different areas of a site. The City is among the PLPs subject to this analysis. The City owned approximately 1.9 acres at the Site and leased a portion of this property identified as Cell 1 to PWT for the entire duration of PWT's operations. Cell 1 included the heavily contaminated tank farm area which, together with the Port's property on Cell 2, accounted for the vast majority of cleanup costs.

100.   Additionally, the Port, through the funding it received from Ecology and other third parties, never incurred an portion of an orphan share, yet has realized and will realize substantial economic benefits resulting from the acquisition, remediation, redevelopment, and lease or sale of the Site.

101.   The existence of prior agreements between parties is recognized as relevant in equitable allocation.

102.   The parties' 2002 FPA provided a "final allocation" focused on Cell 3 because that portion of the Site was owned partly by the Port and partly by Union Pacific. Pursuant to the FPA, the Port received funding and technical support from Union Pacific totaling $1.78 million, including $861,000 in direct payments to the Port by Union Pacific.

103.   In exchange for Union Pacific's financial and technical support, and subject to completion of the RI/FS, the FPA required the Port to "support and cooperate" with Union Pacific's efforts to obtain a "comfort letter" from Ecology or to "negotiate a cash-out Consent Decree for the entire Site with Ecology."

104.     However, the Port specifically reserved its rights under MTCA to bring a contribution action. Grening acknowledged that the Port did not "support and cooperate" with Union Pacific's proposed Consent Decree with Ecology and, in fact, actively opposed it.

105.     The conduct of parties is recognized as relevant in equitable allocation.

106.     The FPA contains two inconsistent provisions that in retrospect impact this Court's view of two equitable factors: (1) prior agreements between the parties, and (2) conduct of the parties. Union Pacific wanted the Port to "support and cooperate" with Union Pacific's efforts to obtain a "comfort letter" from Ecology or to "negotiate a cash-out Consent Decree for the entire Site with Ecology." On the other hand, the Port specifically reserved its rights under MTCA to bring a contribution action.

107.     Other than receiving funding and technical support through the FPA, the Port sought to limit Union Pacific's involvement until after the Port had obtained grant funding and loan forgiveness from Ecology, an RI/FS had been approved and Site remediation was substantially completed, the Port had acquired the former Union Pacific property, and the Port had obtained its own Consent Decree with Ecology.

108.     Early in the grant funding program, Port Executive Director Grening noted that "if WDOE management finds out that UPRR is getting involved, DOE will pursue UPRR as a 'deep pocket'— addition[al] grants & loans for project will be stopped."

109.     Years later, in 2013, when Ecology was considering naming Union Pacific as a PLP and the Port was acquiring the Union Pacific property, Ecology noted that "[t]he Port wants to make sure property purchase of right of way land from UP goes through before we muddy the waters with pesky PLP issues."

110. Ecology Cleanup Project Manager Rankine advised his supervisors on April 8, 2013, that Ecology "has not and is not going to list Union Pacific Railroad as a PLP for the PWT site" because "they have been cooperating with cleanup efforts and cost contribution, and declaring them as a PLP at this point would be counterproductive." Ecology officials subsequently met with Port representatives concerning Union Pacific's potential PLP status.

111. The Port requested that Union Pacific be excluded from meetings with Ecology concerning PLP status and a proposed consent decree with the Port and the City. Although negotiations had been underway for several months, Ecology's proposed consent decree with the Port and the City was not disclosed publicly (or to Union Pacific) until late July 2013, after the Port's acquisition of Union Pacific's property.

112. This was consistent with Ecology's practice of giving notice upon commencement of the public comment and court approval process for consent decrees, not upon commencement of settlement negotiations. It was the same practice followed by Ecology in the settlement negotiations with Union Pacific. However, in the case of Union Pacific, Ecology informed the Port of settlement negotiations as early as November 2013.

113. The evidence also supports Union Pacific's position with respect to *Gore* factors involving the degree of cooperation by the parties with Federal, State, or local officials, and equitable factors this Court and other courts have recognized concerning: (1) the existence of agreements demonstrating the parties' intent to allocate liability among themselves, (2) the financial benefit that a party may gain from remediation of a site, (3) the potential for windfall double recoveries by a plaintiff, (4) the potential that a plaintiff might make a profit from the cleanup at the expense of another party, and (5) "unclean hands" in excluding another party from active involvement in remedial alternatives and cost-reduction measures.

114.    The evidence has shown that, in exchange for Union Pacific's financial and technical support, and subject to completion of a RI/FS, the FPA required the Port to "support and cooperate" with Union Pacific's efforts to obtain a "comfort letter" from Ecology or to "negotiate a cash-out Consent Decree for the entire Site with Ecology." It is undisputed that all Cell 3 remedial actions were completed pursuant to Interim Actions prior to the issuance of the July 2013 RI/FS for the Site. Yet as Grening acknowledged, the Port did not support and cooperate with Union Pacific's proposed settlement and, instead, actively campaigned against it.

115.    Pendowski and Lawson testified that, despite the Director's decision to put consent decree negotiations "on hold" due to political pressure, Ecology stands by its April 8, 2015 *de minimis* finding and the September 29, 2015 proposed settlement amount of $2,264,037 for Union Pacific. The evidence presented at trial fully supports this finding and dollar amount, based on MTCA allocation principles as well as Policy 520B criteria.

## II.    CONCLUSIONS OF LAW

1.    The Port brought claims against Union Pacific under MTCA, RCW 70.105D.080, for contribution and declaratory relief relating to past and future costs spent by the Port, and for attorneys' fees and costs, relating to environmental investigation and remediation of the former PWT Site.

2.    Union Pacific responded with defenses and counter-claims, including counter-claims for breach of the parties' FPA, breach of the parties' PSA, breach of the implied covenant of good faith and fair dealing, and declaratory relief that the Port has not paid its equitable share of remedial action costs at the Site, that Union Pacific has paid more than its equitable share of remedial action costs at the Site, and that the Port is therefore barred from recovery against Union Pacific in this MTCA contribution action.

3. During the period 1964-1993, PWT leased property at the Site from the Port, the City, and Union Pacific. Following PWT's bankruptcy, Ecology named the Port as a PLP in 1996, the City as a PLP in 1997, and Union Pacific as a PLP in 2013, pursuant to MTCA, based on their respective status as an "owner" and lessor of portions of the Site. Like other rail and trucking companies, Union Pacific was also a common carrier of freight to and from the Site.

4. Following PWT's 1993 bankruptcy, and in connection with the PWT bankruptcy settlement, the Port was assigned rights to PWT equipment, facilities, and other interests at the Site. In 1996, the Port signed the first of several Agreed Orders with Ecology, accepting lead responsibility for Site investigation and remediation. The Port subsequently received more than $90 million in grants, loans and other third-party funding for Site investigation and remediation. The Ecology grants did not require actions for reimbursement, and, except for approximately $4.4 million in no-interest loans that are still due and owing.

5. Union Pacific and the Port executed the FPA, amended in part in 2011, providing an allocation of certain costs relating to Cell 3, as well as financial and technical support from Union Pacific. Union Pacific spent more than $1.76 million pursuant to the FPA, including $861,000 in direct payments to the Port.

6. In consideration of Union Pacific's financial and technical support, and subject to completion of the RI/FS, the FPA requested the Port to "support and cooperate" with Union Pacific's efforts to obtain a "comfort letter" from Ecology or to "negotiate cash-out Consent Decree for the entire Site with Ecology." At the same time the Port reserved the right to pursue a contribution action under MTCA.

7. The Port and the City entered into a Consent Decree with Ecology concerning remedial actions and responsibilities relating to the Site. Ecology provided public notice of the

1 proposed Consent Decree but notice was not given upon commencement of settlement

2 negotiations. The Consent Decree was approved by the Clark County Superior Court on

3 November 5, 2013.

4      8.     Shortly after the listing of Union Pacific as a PLP on November 6, 2013, Union

5 Pacific and Ecology engaged in settlement negotiations under Policy 520B. On April 8, 2015,

6 Ecology determined that Union Pacific's contribution to the Site was minimal in amount and

7 toxicity, and that Union Pacific met the statutory criteria for a *de minimis* settlement under Policy

8 520B.

9      9.     The Court concludes that Ecology was authorized by MTCA to adopt Policy

10 520B, that it has discretion to apply Policy 520B on a case-by-case basis, and that Ecology

11 properly applied Policy 520B criteria in the case of Union Pacific, when it determined on April

12 8, 2015, that Union Pacific's contribution to the Site was minimal in amount and toxicity, and

13 that it met the statutory criteria for a *de minimis* settlement under MTCA and Policy 520B.

14      10.     The Court further concludes that, on September 29, 2015, Ecology properly

15 determined that Union Pacific's *de minimis* liability for the Site was $2,264,037, subject to

16 negotiation and entry of a Consent Decree, in accordance with MTCA and Policy 520B. Union

17 Pacific's negotiation of the Consent Decree did not proceed due to political pressure on the

18 Director of Ecology by the Port.

19      11.     The evidence demonstrated that Union Pacific spent more than $1.78 million on

20 remedial action expenses, pursuant to the FPA, including $861,000 in direct payments to the

21 Port.  The evidence has also shown that Union Pacific agreed to pay Ecology an additional

22 $2,264,037 in funding that would directly benefit remedial action costs at the Site and that Union

23 Pacific would have made this payment to Ecology but for the Port's opposition and successful

24

1　lobbying of the Director of Ecology, who directed Ecology to put "on hold" the negotiation of a

2　consent decree to document the *de minimis* settlement with Union Pacific.

3　　　　12.　　Thus, the evidence demonstrates that Union Pacific has paid, and agreed to pay

4　Ecology, a total of more than $4 million, which exceeds the $2,974,000 that Ecology estimated

5　as the cleanup costs relating to Cell 3 (only part of which was the former Union Pacific property)

6　and related Lake River sediments.

7　　　　13.　　The evidence also demonstrates that Ecology has statutory authority under RCW

8　70.105D.050(8) to recover "the expenditure of moneys under the state and local toxics control

9　accounts," and Ecology reserved its right to pursue "cost recovery against PLPs not a party to

10　this Decree" in its November 2013 Consent Decree with the Port and the City of Ridgefield.

11　However, as Pendowski and Lawson testified, Ecology elected instead to pursue contribution and

12　evaluate Union Pacific's eligibility for a settlement under Policy 520B–and Union Pacific was

13　found to be eligible–to pursue a settlement that would provide funds to directly benefit remedial

14　action costs at the Site.

15　　　　14.　　The Court concludes that Ecology's April 8, 2015 finding that Union Pacific's

16　contribution at the Site was "minimal in amount and toxicity," pursuant to Policy 520B, is

17　supported by the evidence and is entitled to deference by the Court. *See Douglass v. Shamrock*

18　*Paving, Inc*., 189 Wash.2d 733, 744-46, n. 1 (2017) (courts should "defer to Ecology 'on

19　technical issues based on Ecology's specialized expertise'" in MTCA matters); *see also United*

20　*States v. W.R. Grace & Co*., 429 F.3d 1224, 1227 (9th Cir. 2005) ("considerable deference" to

21　agency determinations under CERCLA).

22　　　　15.　　The Court further concludes, consistent with *Douglass*, that Ecology's September

23　29, 2015 conclusion that $2,264,037 was the appropriate amount for Union Pacific's contribution

24

1    for a cash-out settlement for the Site, pursuant to Policy 520B, is supported by the evidence and

2    entitled to deference by the Court.

3        16.    Although the Court concludes that Ecology properly applied Policy 520B in

4    finding Union Pacific's contribution to be *de minimis* and determining the monetary amount for

5    settlement, the Court also performed an evaluation of the evidence under equitable factors

6    otherwise applicable in a MTCA contribution action. The Court concludes, based on this analysis

7    and as set forth in the Findings of Fact, that Union Pacific's contribution is *de minimis,* and that

8    Ecology correctly determined the amount Union Pacific should pay to resolve its liability at the

9    Site.

10       17.    Under MTCA, "[l]iable persons have a right to seek contribution from other

11   potentially liable persons." *Pope Res., LP v. Washington State Dep't of Nat. Res.*, 190 Wash.2d

12   744, 750 (2018) (*citing* RCW 70.105D.080). In allowing such actions, MTCA "instructs the

13   courts to award recovery costs 'based on such equitable factors as the court determines are

14   appropriate.'" *Union Station Assocs., LLC. v. Puget Sound Energy, Inc.*, 238 F. Supp. 2d 1218,

15   1225 (W.D. Wash. 2002) (*citing* RCW 70.105D.080). Thus, "Washington courts have used this

16   section to apportion damages equitably, not on a joint and several theory." *Id.* While liability

17   under MTCA may be determined with reference to RCW 70.105D.040, "the means for

18   determining recovery and the mechanics of actions among [PLPs] is governed by .080. That

19   section turns to equitable factors to determine contribution, not a full cost recovery scheme."

20   *Union Station*, 238 F. Supp. 2d at 1226.

21       18.    Washington courts look to federal CERCLA case law to interpret these MTCA

22   provisions. *See Dash Point Vill. Assocs. v. Exxon Corp.*, 86 Wash. App. 596, 607-08, n. 24

23   (1997), *amended on denial of reconsideration*, 86 Wash. App. 596 (1998). Under CERCLA, "the

24

court may allocate response costs among liable parties using such equitable factors as the court

determines are appropriate." *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000)

(citing 42 U.S.C. § 9613(f)(1)). "This language gives district courts discretion to decide what

factors ought to be considered, as well as the duty to allocate costs according to those factors."

*Boeing Co.*, 207 F.3d at 1187. Washington courts similarly "apply a broad range of equitable

factors to determine the amount of recovery" under CERCLA and MTCA. *Dash Point Vill.*

*Assocs.*, 86 Wash. App. at 608, fn. 24; RCW 70.105D.080 ("Recovery shall be based on such

equitable factors as the court determines are appropriate.").

19.     Within certain bounds, MTCA authorizes the Court to utilize its discretion in

determining the equitable factors that are appropriate in allocating remedial action costs

attributable to a PLP in a private contribution action.

20.     Under both CERCLA and MTCA, the analysis often includes the "*Gore* Factors,"

which *Dash Point* noted as follows:

> (1) the ability of the parties to demonstrate that their contribution to a
> discharge, release or disposal of a hazardous waste can be distinguished;
> (2) the amount of the hazardous waste involved; (3) the degree of toxicity
> of the hazardous waste involved; (4) the degree of involvement by the
> parties in the generation, transportation, treatment, storage, or disposal of
> the hazardous waste; (5) the degree of care exercised by the parties with
> respect to the hazardous waste concerned . . .; and (6) the degree of
> cooperation by the parties with Federal, State, or local officials to prevent
> any harm to the public health or the environment.

*Id.*

21.     Courts have also applied the "*Torres*" categories, which include the extent to

which cleanup costs are attributable to wastes for which a party is responsible. *See United States*

*v. Davis*, 31 F. Supp. 2d 45, 63 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001); *see also Seattle*

*Times Co. v. LeatherCare, Inc.*, No. C15-1901 TSZ, 2018 WL 3873562, at *46 n. 73 (W.D.

Wash. Aug. 15, 2018), *appeal filed*, No. 18-35773 (9th Cir. Sept. 14, 2018) (applying *Torres*

categories); *Arkema, Inc. v. Asarco, Inc*., No. C05-5087 RBL, 2007 WL 1821024, at *10 (W.D. Wash. June 22, 2007) (factors included regulatory findings and evidence of historical activities and time periods when contamination occurred).

22.    The Court concludes, based on the evidence at trial that much of the contamination of the Site and the off-property area occurred during the "Vietnam Order" in the mid-1960s, before the Union Pacific property was being used for storage or shipment of treated wood products.

23.    The Court further concludes, based on the evidence at trial, that remediation of Cell 3 was divisible from the rest of the Site, and that the limited contamination and the cost of remediation was less than $3 million for Cell 3, and related sediments, as compared to more than $85 million for the rest of the Site.

24.    The Court further concludes, based on the evidence at trial including testimony by Ecology witnesses and acknowledgements by Port experts and consultants, that there was no significant vehicle tracking, airborne dust dispersion, or other transport or migration of contaminants from Cell 3 resulting in additional remedial actions or costs in other areas of the Site or in the off-property area.

25.    The Court concludes that relating to historical uses and operations, Site characterization data, the nature and extent of contamination, the relative cost of remediation, prior agreements of the parties, and actions by Ecology all show Cell 3-related contamination and remedial action costs to be divisible from the rest of the Site.

26.    The Court finds that the Supreme Court's criteria for divisibility of a portion of a site under CERCLA.

27. The Court further concludes that the evidence presented at trial is similar but stronger than that in *BNSF*. Like *BNSF*, the most severe contamination, the sources of that contamination, and the vastly greater remediation requirements and costs were on Cells 1 and 2, property owned by the Port and formerly owned by the City. Like *BNSF*, the actual chemical storage, processing, and treatment operations and related releases occurred in Cells 1 and 2, the Port's property, while Union Pacific's property was used for storage and shipment of finished products. Like *BNSF*, the Union Pacific property was not used for treated wood storage for the entire period of PWT operations and, in fact, was not used for treated wood storage during the Vietnam Order, when most of the contamination occurred. And like *BNSF*, the surface area of Union Pacific property accounted for only a small portion of the Site. Here, however, the parties also agreed on divisibility of Cell 3-related remediation and costs, as did Ecology. Accordingly, and consistent with Ecology's determination under Policy 520B, Union Pacific's equitable share is a share of Cell 3-related costs, not a share of costs unrelated to Cell 3.

28. The Ninth Circuit recently held in an equitable allocation under CERCLA that "[t]he parties' prior course of dealings concerning cleanup costs from the same site also constitutes a relevant factor in the allocation analysis," including the parties' lengthy course of dealings relating to the site. *TDY Holdings, LLC v. United States*, 885 F.3d 1142, 1149 (9th Cir. 2018). Other courts have similarly held that, in addition to the *Gore* factors and *Torres* categories, equitable factors can include (1) the existence of agreements demonstrating the parties' intent to allocate liability among themselves, (2) the financial benefit that a party may gain from remediation of a site, (3) the potential for windfall double recoveries by a plaintiff, (4) the potential that a plaintiff might make a profit from the cleanup at the expense of another party, and (5) "unclean hands" in excluding another party from active involvement in remedial

alternatives and cost-reduction measures. *Seattle Times*, 2018 WL 3873562, at *46 n.74, *citing Lockheed Martin Corp v. United States*, 35 F. Supp. 3d 92, 123-124 (D.D.C. 2014).

29.     Other federal court have considered similar criteria in assessing equitable factors in a CERCLA allocation analysis. *See Halliburton Energy Servs., Inc., v. NL Indus.*, 648 F. Supp. 2d 840, 863-64 (S.D. Tex. 2009) (parties' agreements regarding allocation of liability); *Litgo N.J., Inc. v. Martin*, No. 06-2891 AET, 2011 WL 65933, at *9 (D.N.J. Jan. 7, 2011) (party's financial benefit from remediation of site); *Litgo N.J., Inc., v. Comm'r N.J. Dep't of Envtl. Prot.*, 725 F.3d 369, 391 (3d Cir. 2013) (the potential for windfall "double recoveries" by a plaintiff); *Friedland v. TIC-The Indus. Co.*, 566 F.3d 1203, 1207 (10th Cir. 2009) (same); *Vine St., LLC v. Keeling ex rel. Estate of Keeling*, 460 F. Supp. 2d 728, 765 (E.D. Tex. 2006), *rev'd on other grounds sub nom.*, *Vine St., LLC v. Borg Warner Corp.*, 776 F.3d 312 (5th Cir. 2015) (potential that plaintiff might make a profit on the contamination at the expense of another party); *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, 298 F. Supp. 3d 1194, 1198-1202 (N.D. Ind. 2018) (knowing purchase of contaminated property in a bankruptcy sale, without liability protection, and seeking economic gain from the purchase and remediation of the property).

30.     The Court concludes that Union Pacific was an owner, lessor, and common carrier of freight, was not an "operator" within the meaning of MTCA, and did not cause contamination at this Site.

31.     The Court further concludes that the Port acquired the PWT property in the bankruptcy sale, without liability protection, and accepted responsibility for the remedial action through the Agreed Orders with Ecology.

32.     The Court specifically concludes that the Port benefitted from funding from government agencies, insurers, and Union Pacific totaling more than $90 million, including more

1 than $80 million in grants and loans from Ecology, all but $4.4 million of which have been

2 forgiven, resulting in a Site that is remediated and prepared for redevelopment, leasing, or sale at

3 little or no expense to the Port. As the Court observed during closing arguments at trial, "[t]he

4 Port has achieved their end of restoring the land at relatively modest funds."

5      33.     The Court further concludes that Union Pacific has paid, and agreed to pay

6 Ecology, in an amount roughly equal to the amount still owed by the Port ($4.4 million).

7 Accordingly, the Port cannot recover from Union Pacific in this MTCA contribution action.

8      34.     The Port shall cease any opposition to the *de minimis* settlement agreement

9 between the Union Pacific and Ecology. The Court will retain jurisdiction for the limited purpose

10 of allowing the completion of the *de minimis* settlement and consent decree.

11      35.     The financial benefits inured to the Port are not quantifiable and are largely

12 speculative.

13      36.     Currently, the Port owes $4.4 million to Ecology. With the execution of the *de*

14 *mimimis* settlement, together with prior expenditures by the Union Pacific, the total obligation to

15 the clean-up approximates $4 million plus. An additional equitable factor is the skill and

16 diligence of the Port and its staff in managing this clean-up effort.

17      37.     Neither party is a prevailing party in this action. There will not be an award of

18 attorney fees for either party.

19 **III.    JUDGMENT**

20     Based on the foregoing Findings of Fact and Conclusions of Law, the Court hereby

21 concludes as follows:

22     1.  Union Pacific is entitled to a judgment that the Port shall take nothing by way of the

23            Complaint or any of the claims stated therein;

24

2. Union Pacific is entitled to a judgment that the Complaint and each cause of action contained therein be dismissed with prejudice as to Union Pacific;

3. Union Pacific is entitled to a judgment against the Port on Union Pacific's counter-claim for a declaration that Union Pacific has no liability to the Port for any remedial action costs that Plaintiff has incurred, or will incur, at the Site; and

4. The Port is entitled to judgment that the Union Pacific shall take nothing by way of the breach of contract claims contained in the Counterclaim.

5. The Court retains jurisdiction in this matter until such time as the *de mimimis* settlement is finalized with a signed Consent Decree and the payment by Union Pacific to Ecology in the amount of $2,264,037.

**IT IS SO ORDERED.**

**DATED** this 7th day of February, 2019.

Ronald B. Leighton
United States District Judge